## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO
### Honorable Howard R. Tallman

| | | |
|---|---|---|
| In re: | ) | **Case No. 13-13098 HRT** |
| **PLATTE RIVER BOTTOM, LLC,** | ) | **Chapter 11** |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| In re: | ) | **Case No. 13-29319-HRT** |
| **NOLAN ULMER and** | ) | **Chapter 11** |
| **PATRICIA ULMER,** | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | |
| | ) | |
| In re: | ) | **Case No. 13-29368-HRT** |
| **UIV PROPERTIES RS, LLC,** | ) | **Chapter 11** |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| In re: | ) | **Case No. 29369-HRT** |
| **NPK WATER HOLDING, LLC,** | ) | **Chapter 11** |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| In re: | ) | **Case No. 13-29371-HRT** |
| **NPK INVESTMENTS, LLC,** | ) | **Chapter 11** |
| | ) | |
| Debtor. | ) | **JOINTLY ADMINISTERED CASES** |
| | ) | **UNDER CASE No. 13-13098-HRT** |

## ORDER ON MOTION TO DISMISS

This case comes before the Court on Advantage Bank's *Motion to Dismiss Chapter 11 Cases and Memorandum in Support Thereof* (docket #265) (the "Motion").

## I. BACKGROUND FACTS

1.  Platte River Bottom, LLC, ("PRB") filed its voluntary petition under chapter 11 (Case No. 13-13098 HRT) on March 5, 2013. Since that time, it has remained in possession of its assets, and has operated as a Debtor-in-Possession.  It owns real

property and certain water rights.  It generates limited income by leasing a portion of its real property.

2.      A non-debtor entity, Ulmer Holding, LLC, ("Ulmer Holding") is the sole owner of PRB.  Ulmer Holding is wholly owned by Nolan and Patricia Ulmer.

3.      Nolan and Patricia Ulmer filed a petition for relief under chapter 11 (Case No. 13-29368-HRT) on November 20, 2013.

4.      On November 21, 2013, three other entities that are wholly owned by Ulmer Holding filed petitions under chapter 11.  Those entities are UIV Properties RS, LLC (Case No. 13-29368-HRT) ("UIV"); NPK Water Holding, LLC (Case No. 13-29369-HRT) ("NPK Water"); and NPK Investments, LLC (Case No. 13-29371-HRT) ("NPK Investments").

5.      The case filed by the Ulmers along with UIV, NPK Water, and NPK Investments are being jointly administered with the PRB case (collectively, the "Debtors").  All of the business entities are ultimately 100% owned and controlled by Nolan and Patricia Ulmer as a result of their ownership and control of Ulmer Holding.

6.      PRB owns approximately 188 acres of real property in Weld County, Colorado, with an address of 17043 County Road 394, LaSalle, Colorado (the "Property").

7.      PRB acquired the Property at various times and in the form of various individual parcels along with associated water rights.  At the time of acquisition, the water rights consisted principally of shares in the Godfrey Ditch Company ("Godfrey Shares").

8.      PRB and/or various other of the Debtors entered into multiple agreements with the City of Evans (the "City") known as dry up covenants whereby Godfrey Shares were signed over to the City in exchange for Equivalent Residential Units ("EQRs").  An EQR is calculated to be roughly equivalent to the water usage of a single family residence.[1]

---

[1] An EQR can best be understood as a development right.  EQRs issued by the City entitle the holder to obtain municipal water service from the City.  Under the City's water ordnance, a person wishing to use land in a way that requires increased demand for City water service must dedicate sufficient water rights to the City to support that demand.  Evans, Colorado - Municipal Code § 13.08.040.  The City currently defines an EQR as

> a receipt issued by the City of Evans for current or future development within the limits of the City in exchange for dedication to the City of sufficient water rights to

(continued...)

ORDER ON MOTION TO DISMISS
Bankruptcy Case No. 13-13098 HRT

9.  According to the City's Resolution No. 29-2015 (the "Resolution"), adopted on October 20, 2015, by the City Council of the City of Evans,

> between 2004 and 2012, a developer, Nolan Ulmer, either personally or through one of several entities he created, agreed with the City's then public works director, Earl Smith, to convey shares in the Godfrey Ditch Company ("Godfrey Ditch shares") to the City in exchange for EQRs, and the conversion factor used between Mr. Ulmer and Mr. Smith was 80 EQRs for each Godfrey Ditch share. . . . [T]he Godfrey Ditch shares were purportedly conveyed to the City through a series of separate transactions occurring on the following dates:
>
> | | |
> |---|---|
> | 1/7/04 | 3 shares in exchange for 240 EQRs |
> | 1/12/04 | 16 shares in exchange for 1280 EQRs |
> | 6/1/05 | 1 share in exchange for 80 EQRs |
> | 7/17/06 | 5 shares in exchange for 400 EQRs |
> | 10/24/12 | 1 share in exchange for 80 EQRs |
>
> In its Resolution, the City Council finds that the City's issuance of EQRs to Ulmer and his entities in exchange for Godfrey Ditch shares was invalid because it was not approved by the City Council in accordance with the applicable City ordinances and in its Resolution, the City Council concludes that
>
> > 1. The purported agreements seeking to convey Godfrey Ditch shares to the City of Evans in exchange for EQRs, as summarized above are not accepted by the City, and are hereby deemed invalid.

---

[1](...continued)
provide the volume of treatable raw water needed to serve an average dwelling unit housing 3.5 persons and having not more than two thousand five hundred (2,500) square feet of irrigated area, as such average volume is determined from time to time by the City Engineer or their designee. An EQR is not a share of water nor an interest in a water right and the City does not place a monetary price or value on an EQR. The EQR unit value assigned to uses is set forth in the table of EQR's adopted by resolution.
Evans, Colorado - Municipal Code § 13.08.030.  Thus, the holder of EQRs is entitled to obtain municipal water service for use in a particular development project within the City.  Evans, Colorado - Municipal Code § 13.08.072.  EQRs are transferrable under certain conditions.  *Id.*

ORDER ON MOTION TO DISMISS
Bankruptcy Case No. 13-13098 HRT

       2.  The EQRs issued in connection with the purported conveyances of Godfrey Ditch shares to the City are hereby cancelled and of no further force or effect.

10.     PRB and other of the Debtors have pledged EQRs as collateral for loans received from both Advantage Bank ("Advantage"), the Movant herein, and Northstar Bank f/k/a Colorado Community Bank ("Northstar"), which has joined in the Motion.

11.     The Debtors and the banks are involved in significant controversies concerning, among other issues, the banks' foreclosure of their security interests in EQRs.

12.     On May 9, 2014, PRB filed an adversary action in this Court seeking to pursue claims against the banks and the City (Adversary No. 14-1231-HRT). After finding that the issues raised by the Debtor were controlled by state law and were duplicative of issues already the subject of pending state court litigation, the Court abstained from adjudication of those issues (Adversary No. 14-1231-HRT, docket #135). In addition, the Court lifted the automatic stay in order to allow the parties to fully litigate their disputes and to liquidate damages. The Court left the stay in place with respect to property of the bankruptcy estate.

## II.  DISCUSSION

Advantage, joined by Northstar, seeks dismissal of the Debtors' bankruptcy cases. Under 11 U.S.C. § 1112,

> Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, *for cause* unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1112(b)(1) (emphasis added). Examples of some particular circumstances that provide cause for dismissal under § 1112(b) are:

> (A)  substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;
> (B)  gross mismanagement of the estate;
> (C)  failure to maintain appropriate insurance that poses a risk to the estate or to the public;
> (D)  unauthorized use of cash collateral substantially harmful to 1 or more creditors;
> (E)  failure to comply with an order of the court;

ORDER ON MOTION TO DISMISS
Bankruptcy Case No. 13-13098 HRT

(F)  unexcused failure to satisfy timely any filing or reporting requirement
established by this title or by any rule applicable to a case under this chapter;
(G)  failure to attend the meeting of creditors convened under section 341(a) or an
examination ordered under rule 2004 of the Federal Rules of Bankruptcy Procedure
without good cause shown by the debtor;
(H)  failure timely to provide information or attend meetings reasonably requested
by the United States trustee (or the bankruptcy administrator, if any);
(I)  failure timely to pay taxes owed after the date of the order for relief or to file
tax returns due after the date of the order for relief;
(J)  failure to file a disclosure statement, or to file or confirm a plan, within the
time fixed by this title or by order of the court;
(K)  failure to pay any fees or charges required under chapter 123 of title 28;
(L)  revocation of an order of confirmation under section 1144;
(M)  inability to effectuate substantial consummation of a confirmed plan;
(N)  material default by the debtor with respect to a confirmed plan;
(O)  termination of a confirmed plan by reason of the occurrence of a condition
specified in the plan; and
(P)  failure of the debtor to pay any domestic support obligation that first becomes
payable after the date of the filing of the petition.

11 U.S.C. § 1112(b)(4).

The factors listed in § 1112(b)(4) are illustrative of common circumstances that arise in the
context of chapter 11 cases that can indicate the presence of cause for dismissal.  However, the list
is non-exclusive; Congress did not undertake to supply an exhaustive list of reasons to dismiss or
convert a chapter 11 case.  *See, e.g., Hall v. Vance*, 887 F.2d 1041, 1044 (10th Cir. 1989); *In re
Colon Martinez*, 472 B.R. 137, 144 (B.A.P. 1st Cir. 2012); *In re Landmark A. Hess Farm, LLC*,
448 B.R. 707, 711 (Bankr. D. Md. 2011); *In re Paterno*, 511 B.R. 62, 66 (Bankr. M.D. N.C.
2014); *In re Van Eck*, 425 B.R. 54, 59 (Bankr. D. Conn. 2010); *In re Orbit Petroleum, Inc.*, 395
B.R. 145, 147 (Bankr. D. N.M. 2008).

Courts always evaluate the totality of the circumstances to determine if cause exists to
dismiss or convert a chapter 11 case under § 1112(b).  *See, e.g., In re Original IFPC
Shareholders, Inc.*, 317 B.R. 738, 743 (Bankr. N.D. Ill. 2004); *In re Argus Group 1700, Inc.*, 206
B.R. 737, 753 (Bankr. E.D. Pa. 1996) *aff'd sub nom. Argus Group 1700, Inc. v. Steinman*, 206
B.R. 757 (E.D. Pa. 1997); *In re WLB-RSK Venture*, 296 B.R. 509, 514 (Bankr. C.D. Cal. 2003)
*aff'd*, 320 B.R. 221 (B.A.P. 9th Cir. 2004) *aff'd*, 223 Fed. Appx. 555 (9th Cir. Feb. 22, 2007)
(unpublished); *In re Walden Ridge Dev., LLC*, 292 B.R. 58, 62 (Bankr. D. N.J. 2003); *In re 801 S.
Wells St. Ltd. Partn.*, 192 B.R. 718, 726-27 (Bankr. N.D. Ill. 1996).

The evidence and the totality of the circumstances persuades the Court that Debtors'
principal, Nolan Ulmer, has abused the bankruptcy process by filing these related bankruptcy
cases to hinder and delay his secured creditors from enforcing their rights with no reasonable

ORDER ON MOTION TO DISMISS
Bankruptcy Case No. 13-13098 HRT

prospect of proposing a confirmable plan of reorganization.  There is no "effective reorganization *that is in prospect*."  *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 376 (1988) (emphasis in original).

A.  The Debtors' Plan

The Debtors' jointly proposed chapter 11 plan (docket #201) (the "Plan") broadly provides that the Property is to be developed as a sand and gravel operation and for water storage.  The Debtors intend to develop this business from the ground up as no such enterprise is currently in existence.

At the time the Debtors acquired the parcels of real estate that now make up the Property, Ulmer caused the Debtors to enter into the dry-up covenants with the City, under which PRB, and possibly other Ulmer entities, gave Godfrey Shares to the City in exchange for EQRs.  Later, the Debtors pledged the EQRs to both Northstar and Advantage as collateral for loans.  In late 2014, the City served notice on the Debtors that Earl Smith, its director of public works at the time, lacked the authority to enter into those transactions.  On October 20, 2015, the City's City Council voted to repudiate those agreements; to void the EQRs that the City issued; and to return the original Godfrey Shares to Ulmer and his entities.

Ulmer has regularly represented in the Debtors' operating reports, and testified at this hearing, that he believed the value of an EQR is approximately $10,000.00.  He testified that a Godfrey Share is worth approximately $115,000.00.  The City had originally created EQRs in exchange for Godfrey Shares at the rate of 80 EQRs per share.  At Ulmer's value of $10,000.00 per EQR and an exchange rate of 80 to 1, the EQRs created in exchange for each Godfrey Share purportedly resulted in EQRs worth $800,000.00 in exchange for each Godfrey share worth $115,000.00.[2]

---

[2] Assuming the accuracy of the values Ulmer testified to, the current market value of the EQRs issued by the City is 595% greater than the current market value of the underlying Godfrey Shares.  It is difficult for the Court to give Ulmer's testimony credence because it raises more questions than it answers.  If the original exchange was done for fair value, then the respective values of EQRs compared to Godfrey Shares have diverged remarkably since the time of the exchanges.  The alternative explanation is that the exchanges bore no relationship to the market for water rights at the time the transactions took place.  Ulmer's evidence provides no explanation for the anomalous values he testified to.  Additionally, according to the City Council's Resolution 29-2015, "water associated with the Godfrey Ditch shares is of limited utility to the City because (1) it cannot be delivered to a place where it can be treated and made into potable water for use within the City, and (2) it can only be delivered for non-potable use to limited areas within the City."  Thus, the Godfrey Ditch water does not even satisfy the requirement in the City's current definition of an EQR that water dedicated to the city in exchange for EQRs must be "treatable raw

(continued...)

ORDER ON MOTION TO DISMISS
Bankruptcy Case No. 13-13098 HRT

The Debtors' Plan calls for the Debtors to replace the banks' security interests in the now void EQRs with interests in Godfrey Shares at the same 80 to 1 exchange rate.  Thus, for each Godfrey share Ulmer[3] proposes to use to secure the debts to either Northstar or Advantage, his Plan would replace collateral he believes was worth $800,000.00 immediately prior to the City's action voiding the EQRs with collateral he believes has a current value of $115,000.00.

The Court doubts that the City's repudiation of the dry-up covenants that its then public works director, Earl Smith, entered into with Ulmer and various of the entities he controls is the end of the story.  The history of the litigation that is ongoing in the state courts, the history of these bankruptcy cases in this Court, and the evidence the Court heard in connection with the Motion to Dismiss, persuade the Court that the ongoing disputes between Ulmer, his entities, the banks, and now the City, will be the subject of protracted litigation.  That litigation will necessarily involve the water rights pledged to the banks as collateral and the validity of the City's action of voiding the EQRs the banks have relied upon as security for their debts.  The litigation will determine the nature and, ultimately, the value of the secured creditors' collateral.

The Debtors' Plan assumes that the secured creditors' collateral is now Godfrey Shares that are worth less than 15% of Ulmer's estimate of the value of the EQRs that were originally pledged as collateral immediately before the City's Resolution.  Debtors' Plan assumes, at the end of the day, that result will be validated by the state courts because it makes no provision for any other resolution of the controversy.

Regarding the proposed start-up sand and gravel operation, Ulmer has not initiated the permitting process.  Ulmer has not secured financing for his proposed operation nor is there evidence of progress toward securing financing.  Moreover, Ulmer's revenue projections are open to serious question.  For the reasons that follow, the Court finds cause to grant Advantage's Motion and to dismiss these cases.

B.  Ulmer's Bad Faith

Ulmer, through Ulmer Holding, a non-debtor entity, owns and controls PRB; UIV; NPK Water; NPK Investments; RGT, LLC; and Lonestar Management, LLC.  Ulmer Holding, Lonestar Management, and RGT are not Debtor entities.

---

[2](...continued)
water."  Evans, Colorado - Municipal Code § 13.08.030.  It is little wonder that the City Council rejected the transactions.  The mystery is why it took so long.

[3] Because of Ulmer's 100% ownership and control of the debtor entities, the Court uses "Ulmer" interchangeably with "Debtors."

ORDER ON MOTION TO DISMISS
Bankruptcy Case No. 13-13098 HRT

None of the entities for which Ulmer has caused bankruptcy petitions to be filed are reorganizing businesses because all are passive entities that conduct no significant business operations.[4] That is not to say that none of Ulmer's entities produce revenue from business operations but that Ulmer has chosen to cause bankruptcy petitions to be filed only with respect to the non-revenue-producing entities.

The result is two-fold. The bankruptcy filings have stayed legal actions with respect to assets held by the Debtor entities and it has allowed Ulmer to continue conducting business through his non-debtor revenue-producing entities, which remain beyond the scrutiny of his creditors in this bankruptcy proceeding. At the same time, Ulmer uses revenues generated by his non-debtor entities to fund necessary expenses of the bankruptcy cases. These payments appear to be inter-entity transfers without consideration because none of the Debtor entities have applied to the Court to incur debt, to transfer assets, or grant security interests in exchange for the payments. This is consistent with Ulmer's casual treatment of the separate corporate identity of his various business entities.

The entities that Ulmer has chosen to subject to the Court's jurisdiction are merely passive repositories of assets without business operations. The rehabilitation of a business enterprise is the primary legitimate purpose of a chapter 11 case. But that is not Ulmer's intention in these cases. There are no business enterprises to rehabilitate. The evidence amply demonstrates that Ulmer's purpose is to frustrate his secured creditors' exercise of their legitimate rights by staying the ongoing state court cases with these various bankruptcy petitions while he seeks to establish a brand new business. That is not a legitimate good faith use of chapter 11; bankruptcy courts generally do not function as incubators for start-up enterprises. Moreover, after over two and one-half years of sheltering his assets in bankruptcy, he has made no tangible progress toward the establishment of that new business.

Bad faith is not an enumerated ground for dismissal under 11 U.S.C. § 1112(b)(1). Nonetheless, that subsection requires a court to dismiss or convert a chapter 11 case upon a showing of "cause;" and, lack of good faith in filing a chapter 11 case constitutes "cause" under § 1112(b)(1). *In re SGL Carbon Corp.*, 200 F.3d 154, 160 (3d Cir. 1999) ("Chapter 11 bankruptcy petitions are subject to dismissal under 11 U.S.C. § 1112(b) unless filed in good faith."); *In re Marsch*, 36 F.3d 825, 828 (9th Cir. 1994) ("courts have overwhelmingly held that a lack of good faith in filing a Chapter 11 petition establishes cause for dismissal."); *In re Pacific Rim Investments, LLP*, 243 B.R. 768, 771 (D. Colo. 2000) ("It is well established under the Bankruptcy Code, as it was under the Bankruptcy Act, that a Chapter 11 Petition must be filed in good faith, and if not, dismissal of the case is an appropriate remedy.").

---

[4] PRB does receive $20,000.00 annual cash rent from farm property which it owns.

ORDER ON MOTION TO DISMISS
Bankruptcy Case No. 13-13098 HRT

The Court finds bad faith in these cases in numerous respects. The principal examples are:

1.      Ulmer has selectively chosen which of his many wholly owned entities to place under bankruptcy jurisdiction – filing cases only on behalf of non-operating asset holding entities;

2.      Because Ulmer's Plan seeks to initiate a start-up enterprise, there is no evidence to support a finding of feasibility, which makes confirmation of such a plan virtually impossible;

3.      The presence of numerous bad faith indicia found in many of the single asset real estate cases; and

4.      The extraordinary delay and lack of any concrete progress in this case is prejudicial to the creditors

*1.  Selective Filing of Entity Cases*

Every practitioner of consumer bankruptcy is likely to have consulted with a client who informs his counsel of which assets or debts he wants to include in his bankruptcy and which he wishes to omit. That will be followed by counsel advising the client of the obligation to include all assets and obligations on his bankruptcy schedules because the Bankruptcy Code does not permit selectively including only particular debts or assets in the bankruptcy case.

Corporations and LLCs, however, are treated as separate persons under the law. This means an individual who conducts his affairs through a network of wholly owned and controlled artificial entities may choose to file a bankruptcy petition on behalf of one or more of those entities without submitting all of them to the bankruptcy process. This raises no red flags where the entities conduct independent business operations. Here, it is only non-operating asset-holding entities for which Ulmer has caused bankruptcy petitions to be filed. His revenue-producing entity (or entities) has remained largely aloof from bankruptcy jurisdiction because Ulmer has elected not to file a case for that entity. Thus, Ulmer has accomplished what our ill-informed consumer debtor was prohibited from doing. He has been able to select which assets to submit to the bankruptcy process and which to withhold.[5]

---

[5] The analogy is not perfect to be sure. Because Ulmer owns the other entities, they are identified on his personal bankruptcy schedules and his ownership interests in those entities are property of his bankruptcy estate. But there the transparency ends. Because Ulmer's interests in those entities are assets of his personal chapter 11 estate, he retains full and exclusive control over them as debtor-in-possession. They do not file monthly operating reports and are not otherwise open to the scrutiny that a bankruptcy debtor is subject to.

ORDER ON MOTION TO DISMISS
Bankruptcy Case No. 13-13098 HRT

### 2. *Lack of Evidence to Support Feasibility Requirement of 11 U.S.C. § 1129(a)(11)*

Chapter 11 is not necessarily restricted to debtors with an existing business to rehabilitate. The difficulty is not one of *per se* eligibility, *see, e.g., Toibb v. Radloff*, 501 U.S. 157 (1991) (holding that individual debtors may file for relief under chapter 11), or even *per se* bad faith. By its very nature, bad faith must be assessed on a case by case basis. The difficulty lies in Ulmer's inability to propose a confirmable plan because he is incapable of producing an operating history to corroborate the feasibility of his projections.

None of the Debtors have an ongoing business operation. Consequently, none of the Debtors produce an income of any significance. Ulmer's plan for remedying that issue is to create a business. The evidence convinces the Court that Ulmer is unable – after sheltering under the Bankruptcy Code for over two-and-a-half years – to demonstrate feasibility of his Plan.

Under 11 U.S.C. § 1129(a)(11), in order to confirm the Debtors' Plan the Court must find that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor . . . unless such liquidation or reorganization is proposed in the plan." *Id.* At a confirmation hearing, Ulmer would be unable to satisfy this confirmation requirement because no evidence exists, beyond purely speculative projections, to show that Ulmer could profitably operate such a project on the Property.

It is problem enough that Ulmer has failed to secure financing for such an operation because without financing details, the Court has no evidence of the debt service requirements and no basis upon which to evaluate the Debtors' projections. Ulmer himself has no history of managing a sand and gravel operation and, because there has never been a sand and gravel operation on the Property, Ulmer's ability to compete with established providers of those materials and competing water storage options is purely speculative. Ulmer's ability to develop such a project in close proximity to the City and also to the Town of LaSalle is unknown. Each and every aspect of the Plan's feasibility is a matter of pure speculation. The Court cannot confirm a plan where the very nature of a debtor's plan means the debtor is unable to produce evidence to support a § 1129(a)(11) feasibility analysis because such evidence does not exist. For this reason alone, these cases are objectively futile and the Court is required to dismiss or convert these cases in accordance with 11 U.S.C. § 1112(b)(1).

Ulmer intends to use revenue from operation of his proposed sand and gravel project to fund payments to creditors under the Plan. Putting aside for the moment the fundamental issue of whether a chapter 11 bankruptcy may be used for the purpose of starting a business that did not exist pre-petition, there are at least two issues: 1) whether the Debtors can fund that initial development; and 2) whether such a sand and gravel operation would produce sufficient revenue to service the debt related to the start-up funding and, in addition, fund the Debtors' pre-petition debt repayment obligations under the Plan.

ORDER ON MOTION TO DISMISS
Bankruptcy Case No. 13-13098 HRT

Ulmer produced no credible evidence of an ability to fund the initial start-up of a sand and gravel operation on the Property.  He gave vague testimony of conversations with representatives of two funding sources.  He also produced an unsigned letter purporting to express interest in the project.  He produced no funding commitment and he produced no witness associated with any funding source to corroborate the availability of funding.

Even if the end result of the next few years of litigation over the nature and value of the secured creditors' collateral is as provided for by the Plan, Ulmer's revenue projections are not persuasive.  Part of the Debtors' projected revenues would come from water leases and Ulmer's projections rely on an annual water lease price set at $2,350.00 per acre-foot.  Ulmer's testimony as to that assumption is unsupported either by expert testimony or documentary evidence.

By contrast, Advantage's expert testified concerning her recent experience of assisting a client to procure water for an augmentation plan in support of a sand and gravel operation.  She testified that the City of Greeley was offering water for an annual lease price of $1,000.00 per acre foot and that the City of Fort Collins was offering water for an annual lease price of $600.00 per acre foot.  Because those offered prices were higher than the client was willing to pay, she testified that she ultimately located a source for water from the Cache La Poudre river at a price of $300.00 per acre foot.  Given that the Debtors expect to derive a portion of their operational cash flow from water leases, the price at which they can expect to lease their water is significant.  The testimony of Advantage's expert undercuts the veracity of Ulmer's projections.  Because Ulmer's testimony was not corroborated by expert evidence or by documentary evidence, the Court does not find Ulmer's projections to be credible.

Ulmer's other projections include little in the way of information regarding the assumptions upon which his projections are based.  Ulmer did provide the Court with estimates for the expenses involved in building a slurry wall and digging a well.  He also provides projections for startup and operating expenses.  But the level of detail contained in the Plan is roughly similar to Ulmer's explanation of his anticipated financing:

NEWCO shall obtain financing from unrelated third parties through debt, equity, or a combination of both in order to fund the operating and ongoing costs of the Augmentation Plan and Gravel Sales.

In both instances, vagueness and speculation rule the day.

The opinion expressed by Advantage's expert was that Ulmer's description of plans for the project described in the Plan is insufficient "to properly evaluate the feasibility and ability to pay all claims by implementation."  The Court agrees.  The evidence before the Court consists of a Plan that is so lacking in detail the Court can make no findings as to feasibility based upon the Debtors' Plan or the evidence the Court heard from Ulmer.

ORDER ON MOTION TO DISMISS
Bankruptcy Case No. 13-13098 HRT

Regardless of the detail that Ulmer may have added to his projections, it would have been detail and projections based on no operational experience because Ulmer is proposing a startup venture rather than rehabilitation of an existing business.  Any such projections would be speculative to a degree that would preclude the Court from making a feasibility finding.  The Court has no evidence before it that Ulmer has ever engaged in the sand and gravel business.  The Property has never before been the site of a sand and gravel or a water storage operation.  All of the infrastructure to support the proposed operation would have to be newly built.

A critical element of feasibility is a debtor's projections of income and expenses.  "All income projections must be based on concrete evidence of financial progress, and must not be speculative, conjectural or unrealistic."  *In re Sound Radio, Inc.*, 103 B.R. 521, 524 (D. N.J. 1989) *aff'd*, 908 F.2d 964 (3d Cir. 1990).  *See also In re Investment. Co. of The S.W., Inc.*, 341 B.R. 298, 311 (B.A.P. 10th Cir. 2006) (The B.A.P. reversed bankruptcy court's feasibility finding where projections were not supported by evidence of past performance.); *In re Clarkson*, 767 F.2d 417, 420 (8th Cir.1985) ("[T]he feasibility test is firmly rooted in predictions based on objective fact.").  It is difficult to conceive of projections that could be less concrete and more speculative in nature that projections for a start-up venture made by an operator with no experience running the proposed business.

*3.  The Presence of Numerous Bad Faith Indicia Found in Many of the Single Asset Real Estate Cases*

Even if the Court were capable of finding some objective possibility of achieving confirmation of a chapter 11 reorganization plan, it would still be required to dismiss or convert these cases under § 1112(b)(1) because of the presence of so many of the factors courts have found indicative of bad faith in the single asset real estate cases.  The Court uses the term "single asset" here in the generic sense.  None of the cases filed by the various business entities was classified as a "single asset real estate" case upon filing, 11 U.S.C. § 101(51B), and no party has sought to have any of them classified as such.

But whether or not the cases meet the Code's definition of single asset real estate cases or not is immaterial.  The cases all revolve around a single undeveloped tract of land that was the subject of litigation in the state courts when the PRB case was filed and also when the remaining cases were filed

Single asset real estate debtors are typically passive holders of real property that is highly leveraged.  They find their way to bankruptcy court after one or more of their secured creditors have commenced foreclosure proceedings under state law following a default on its secured debt.  For those debtors holding property that meets the Code's definition of "single asset real estate," 11 U.S.C. § 101(51B), the Code permits the automatic stay to be lifted upon a showing that the debtor has failed to file a plan within 90 days of the order for relief that "has a reasonable possibility of being confirmed within a reasonable time," 11 U.S.C. § 362(d)(3)(A), and that debtor has failed to commence making interest payment to the secured creditor.  11 U.S.C.

ORDER ON MOTION TO DISMISS
Bankruptcy Case No. 13-13098 HRT

§ 362(d)(3)(B).  Those provisions of the Code reflect a strong Congressional policy to drastically limit the time that a single asset debtor may shelter assets in a bankruptcy case and frustrate the rights of its secured creditors without making substantial progress toward reorganization or without the ability to at least service the interest accruing on its secured debt.

Bad faith is commonly found in single asset cases involving debtors with no current business operations to reorganize.  *See, e.g. In re Pacific Rim Investments, LLP*, 243 B.R. 768 (D. Colo. 2000) (Debtor, which owned an office building, filed bankruptcy petition to avoid adverse outcome of state court litigation.  Bad faith found even though debtor had equity in the asset and had filed a plan.); *In re Little Creek Dev. Co.*, 779 F.2d 1068 (5th Cir. 1986) (Developer filed chapter 11 case when unable to afford bond required to stay state court foreclosure.  Court discussed elements common to abusive filings.); *In re Laguna Associates Ltd. Partn.*, 30 F.3d 734 (6th Cir. 1994), *as amended on denial of reh'g and reh'g en banc* (Sept. 9, 1994) (Affirmed finding of bad faith filing where debtor had single heavily encumbered asset, limited cash flow, no ongoing business, and few unsecured creditors.); *In re Nursery Land Dev., Inc.*, 91 F.3d 1414 (10th Cir. 1996) (Among other factors, debtor filed petition to stop foreclosure, lacked reasonable prospect of reorganization, had no ongoing business, and had only one asset.).

*Little Creek* provides a particularly thorough discussion of this genre of bankruptcy case:

> Determining whether the debtor's filing for relief is in good faith depends largely upon the bankruptcy court's on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities.  Findings of lack of good faith in proceedings based on §§ 362(d) or 1112(b) have been predicated on certain recurring but non-exclusive patterns, and they are based on a conglomerate of factors rather than on any single datum.  Several, but not all, of the following conditions usually exist.  The debtor has one asset, such as a tract of undeveloped or developed real property.  [✔ check].  The secured creditors' liens encumber this tract.  [✔ check].[6]  There are generally no employees except for the principals [✔

---

[6] Ulmer values his Property at $1.4 million and Northstar's appraiser values the Property at $650,000.00.  Even at Ulmer's valuation, the Debtors enjoy no equity in the Property.  Northstar has filed a claim in the amount of $1,068,033.42.  Marlyn and Viola DeTienne have filed a claim in the amount of $1,331,500.00.  Both claims are secured by the Property.  The DeTiennes advanced funds to PRB and secured that loan with a deed of trust on the Property.  Later, as an accommodation to Ulmer, the DeTiennes assigned their note and deed of trust to Northstar as security for its loan to PRB.  The net effect is similar to the situation where two creditors hold first and second priority mortgages on the same property.  Northstar is the current holder of the DeTienne note and deed of trust.  Because the assignment is for security purposes only, the DeTiennes are entitled to have the note and deed of trust reassigned back to them once the Northstar obligation is satisfied.  Thus, even though there is a single deed of trust, the PRB

(continued...)

Page 13 of 17

ORDER ON MOTION TO DISMISS
Bankruptcy Case No. 13-13098 HRT

      check], little or no cash flow [✔ check], and no available sources of income to sustain a plan of reorganization or to make adequate protection payments pursuant to 11 U.S.C. §§ 361, 362(d)(1), 363(e), or 364(d)(1). [✔ check]. Typically, there are only a few, if any, unsecured creditors whose claims are relatively small. [✔ check].[7] The property has usually been posted for foreclosure because of arrearages on the debt and the debtor has been unsuccessful in defending actions against the foreclosure in state court. [✔ check]. Alternatively, the debtor and one creditor may have proceeded to a stand-still in state court litigation, and the debtor has lost or has been required to post a bond which it cannot afford. Bankruptcy offers the only possibility of forestalling loss of the property. There are sometimes allegations of wrongdoing by the debtor or its principals. The "new debtor syndrome," in which a one-asset entity has been created or revitalized on the eve of foreclosure to isolate the insolvent property and its creditors, exemplifies, although it does not uniquely categorize, bad faith cases.

*In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072-73 (5th Cir. 1986) (emphasis added).

      As the court's discussion makes clear, there is no single template for abusive filings of this variety. There are, however, common factors that appear time and again in single asset abusive filings. Here, the Debtors own a single tract of land with appurtenant water rights. They have no employees other than the Ulmers and conduct no business operations beyond renting out a portion of their land for farming purposes. The secured creditors are seeking to foreclose their liens and,

---

      [6](...continued)
Property serves as collateral for both debts and, even at Ulmer's valuation, the Property is worth about $1 million less than the obligations that it secures.

      [7] The Court considers this element to be present even though it appears otherwise because the general unsecured claims against the Debtors are large. The presence of this element generally denotes scant pre-petition business operations. Actively operated business debtors typically incur significant unsecured trade debt that will appear on the debtor's bankruptcy schedules. These present cases do not seem to satisfy this element because the unsecured debts are not "few" and "relatively small" but instead are quite significant. The nature of the unsecured debt, however, confirms that, despite the amount, these are not the type of unsecured debts that are consistent with active business operations. Claim No. 1-1, filed by Republic Credit One, L.P. (the original creditor was New Frontier Bank) for $844,762.47 is the deficiency remaining after liquidation of collateral with respect to a secured debt. Claim No. 5-1 is a modest tax debt to the I.R.S. Claim No. 7-1 was filed by Advantage and reflects the unsecured portion of its secured debt. Claim No. 9-1 is for a large civil judgment taken against Ulmer personally as well as one of his non-debtor entities. Thus, a review of the unsecured claims reveals none of the trade debt that is typical of an actively operated business debtor.

ORDER ON MOTION TO DISMISS
Bankruptcy Case No. 13-13098 HRT

instead of litigating those issues in the state courts, Debtors have stayed the state court actions by filing these bankruptcy cases.

These cases fall squarely within *Little Creek*'s discussion of bad faith cases.  To the factors identified by the *Little Creek* court, the Court would add, in this case, we have a debtor with no intention of rehabilitating an existing business because no business exists.  The Court will not say that a plan that includes initiation of a new business can never pass the feasibility test.  For example a plan proposed by a debtor with concrete experience developing and operating the same type of business may conceivably present a different set of facts than the case at bar.  But the Court can say, with conviction, that these Debtors' cannot confirm a plan that provides for a start-up sand, gravel, and water storage enterprise.  As discussed above, Ulmer's inability to present evidence to the Court with any greater factual basis that pure speculation precludes his ability to satisfy the confirmation requirement of 11 U.S.C. § 1129(a)(11) that requires the Court to find that his Plan is feasible.

Beyond talking to some people and getting estimates for infrastructure necessary for the business Ulmer hopes to start, the Court has heard no evidence of any concrete steps that have been taken to accomplish any of his hoped-for development.  Nor has the Court heard evidence of any serious financing discussions, let alone a financing commitment.

As the *Little Creek* court said:

> Resort to the protection of the bankruptcy laws is not proper under these circumstances because there is no going concern to preserve, there are no employees to protect, and there is no hope of rehabilitation, except according to the debtor's "terminal euphoria."

*Matter of Little Creek Dev. Co.*, 779 F.2d 1068, 1073 (5th Cir. 1986).  This cases have been filed in bad faith and must be dismissed or converted under 11 U.S.C.§ 1112(b)(1).

   *4.  The Extraordinary Delay and Lack of Any Concrete Progress in this Case Is Prejudicial to the Creditors*

The PRB case was filed on March 5, 2013.  At the time, the Property was the subject of state court litigation with both Advantage and Northstar.  The Court is persuaded by evidence it has heard over the course of this case and the general conduct of these cases that a significant factor – if not the primary motivation – for the filing of these bankruptcy cases was to move pending state court litigation into a federal forum.

In the Court's *Order on Motion to Abstain*, entered in Adversary No. 14-1231 HRT (docket #135), the Court found that PRB's adversary action against Advantage and Northstar alleged largely the same causes of action it had alleged as counterclaims in pending state court litigation.  Instead of litigating matters that had already been postured for determination in the

Page 15 of 17

ORDER ON MOTION TO DISMISS
Bankruptcy Case No. 13-13098 HRT

state courts – the natural forum for resolution of state law based property rights issues – Ulmer caused PRB to file a bankruptcy case and then to assert those same matters in a new adversary proceeding in this Court.  Inherent in that maneuver is the delay in addressing the merits of the creditors' claims against the Debtors and the Debtors' counterclaims and defenses.

In terms of effort towards proposing and prosecuting a plan of reorganization, the Court has seen little.  Ulmer did not file his Plan until February 17, 2015, and he never has filed a disclosure statement.  Nor can Ulmer's inactivity in this case be explained by the City's repudiation of dry-up covenants and associated grants of EQRs.  The PRB case was filed in March of 2013 and the Court has heard no evidence that the status of the EQRs was called into question prior to the October 28, 2014, letter from the City's legal counsel to Kim Lawrence.  By that time, the case had been pending on the Court's docket for 602 days.  In this division, the median time from chapter 11 case filing to confirmation for cases filed in 2013 was 407 days and, except for the Ulmer related cases, none of the other 2013 cases filed in this division are still pending confirmation.  The Court recognizes that, after October 28, 2014, there was a question of whether the Debtor was the holder of EQRs or Godfrey Shares.  But that fact is of no consequence to the Court's good faith analysis because the Court has seen no evidence of a good faith effort to formulate and seek confirmation of a plan during the one and one-half years prior to the City first raising that issue.

C.  Dismissal Is the Appropriate Remedy

The Court has considered the advisability of converting these cases to cases under chapter 7.  It has concluded that dismissal is the more appropriate remedy.  As noted, these cases represent a pair of two-party disputes between Ulmer and his secured creditors.  Pendency of these bankruptcy cases creates a positive interference with the ongoing process of litigating and resolving the core issues between the interested parties in the state courts.  Further, the Court has seen no evidence that liquidation of the Debtors would be likely to produce a dividend to unsecured creditors.  For these reasons, the Court finds that the best interests of creditors is served by dismissal.

III.  CONCLUSION

The Court heard much evidence concerning the Debtors' Plan.  It heard evidence concerning the nature and value of various water rights.  Much evidence concerning Ulmer's dealings with the City.  Much evidence concerning Ulmer's dealings with his secured creditors.  All of that evidence served to firmly convince the Court of the correctness of its earlier decision to abstain from adjudicating the core legal disputes between the Debtors and their secured creditors.  Those are disputes that arose and existed long before, and wholly independent of, these current bankruptcy cases.

What the Court did not hear from the Debtors was evidence that served to refute the core issue raised in the Motion – Ulmer's bad faith in filing these bankruptcy cases.  Ulmer's attempts

ORDER ON MOTION TO DISMISS
Bankruptcy Case No. 13-13098 HRT

to rehash in this Court issues that are properly the subject of pending state court litigation confirmed that the bankruptcy cases pending in this Court are, at bottom, two-party disputes. Far from rebutting Advantage's allegations of bad faith, much of Ulmer's evidence served to highlight the existence of bad faith in these cases.

To use the term "Plan" in connection with what Ulmer intends to accomplish in this bankruptcy proceeding is too flattering. There is an outline of a business plan for initiating an entirely new enterprise but with only the most ethereal notions of how the business would be financed and made a reality. The core of the matter is that Ulmer has abused the bankruptcy process by using it as a means for incubating a start-up business operation. In essence, the existing secured creditors would be turned into venture capital providers for Ulmer's start-up enterprise. The fundamental lesson of the single-asset bad faith cases is that such a purpose is an illegitimate use of the bankruptcy process and cases that attempt to do so are filed in bad faith. Therefore, it is

**ORDERED** that Advantage Bank's *Motion to Dismiss Chapter 11 Cases and Memorandum in Support Thereof* (docket #265) is GRANTED. The following cases:

|   |   |
|---|---|
| a. | Platte River Bottom, LLC, Case No. 13-13098-HRT; |
| b. | UIV Properties RS, LLC, Case No. 13-29368-HRT; |
| c. | NPK Water Holding, LLC, Case No. 13-29369-HRT; |
| d. | NPK Investments, LLC, Case No. 13-29371-HRT; and |
| e. | Nolan Ulmer and Patricia Ulmer, Case No. 13-29319-HRT, |

are hereby DISMISSED.

Dated this ____19th____ day of January, 2016.

BY THE COURT:

Howard R. Tallman, Chief Judge
United States Bankruptcy Court

Page 17 of 17